IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOSE and PATRICIA ARAGON,

Plaintiffs,

v.                                                              No. CIV-03-299 JH/LFB

BOARD OF EDUCATION OF THE
LOS LUNAS PUBLIC SCHOOLS, BOARD
OF EDUCATION OF THE ALBUQUERQUE
PUBLIC SCHOOLS, and the NEW MEXICO
PUBLIC EDUCATION DEPARTMENT,

Defendants.

## APS' RESPONSE TO PLAINTIFFS' MOTION FOR
## CONDITIONAL PROTECTIVE ORDER

Defendant Albuquerque Public Schools (APS) hereby responds to Plaintiffs' Motion for

Conditional Protective Order.  APS requests that the motion be denied.

**Plaintiffs' Motion Is Inconsistent With the Claim's They Assert in this Lawsuit**

Plaintiff takes diametrically opposed positions in this lawsuit.

In the Motion for Conditional Protective Order, Plaintiff portrays Matthew Aragon as a

person so disabled and of such unpredictable behavior that he cannot be expected to attend and

answer questions at his own deposition.

Conversely, Plaintiffs' First Amended Complaint alleges Matthew Aragon as a student

who is "similarly situated to age peers living within the State who were allowed and required to

attend public school...." Complaint to ¶46 [Doc. 61].

When it suits Plaintiffs' objectives, Plaintiffs argue that Matthew should be treated the

same as his same aged peers.  But when equal treatment does not suit Plaintiffs' objectives,



Plaintiffs' contend that Matthew should be treated subject to a different set of rules. Plaintiffs cannot have it both ways.

Specific to Plaintiffs' claims against APS, Plaintiffs allege that, after the Aragon family moved to Los Lunas, APS discriminated against Matthew by denying him an open enrollment transfer. First Amended Complaint at ¶38; Plaintiff's Response to Interrogatory No. 8, Exhibit A hereto. The open enrollment transfer process allows for students residing in one school district to enroll in another, if the receiving school district has open enrollment spaces. NMSA 1978 §22-1-4(E)(1998)[1]  Plaintiffs complain that other students, such as Matthew's sister, were granted an open enrollment transfer, while Matthew Aragon's open enrollment requests were denied. Plaintiffs Response to Interrogatory No. 8.

APS' open enrollment transfer process accounted Matthew Aragon's severe disabilities. Most regular education students and even most students with disabilities may appropriately be served in a typical neighborhood school program. Matthew Aragon's disabilities, however, are extreme and severe, such that he could only appropriately be educated in a very unique and specialized program, such as APS' Behavioral Intervention Program which is housed at West Mesa High School. APS' treatment of Matthew Aragon recognized that he has needs that are not similar to most other students.

Plaintiffs sought two open enrollment transfers to neighborhood schools that did not have a highly specialized program of the type needed to appropriately meet Matthew Aragon's needs. These requests were denied because, as Plaintiffs' Motion for Conditional Protective Order illustrates, Matthew Aragon's severe cognitive and behavioral needs were such that he simply could not be plugged into any placement. Plaintiffs' also made open enrollment requests to the

---

[1] Subsequent to the events relative to this lawsuit, the New Mexico legislative amended the Open Enrollment statute. The 1998 version of the statute is the version relevant to this case.

West Mesa High School. These requests were denied because the West Mesa Behavioral Intervention Program was filled beyond capacity with students who reside in Albuquerque, and therefore there were not open enrollment spaces for non-resident students.

Plaintiffs' Motion for Conditional Protective Order supports APS' defenses to Plaintiffs' claims. By the motion, Plaintiffs concede that Matthew's disabilities are such that he is not similarly situated to his same age peers.[2] His same age peers could attend their depositions and answer all questions, and the failure to do so would be sanctionable.

In their motion, Plaintiffs ask the court to treat Matthew Aragon differently *because* of his disability, while at the same time complaining that APS discriminated by taking his disability into account. One reason for APS' setting of Matthew Aragon's deposition is to obtain evidence to pin Plaintiffs down on the issue of whether Matthew Aragon is similarly situated to same aged peers, as is alleged in the First Amended Complaint.

### Plaintiffs' Fail To Establish Grounds for a Protective Order

Fed.R.Civ.P. 26(c) provides that a court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Plaintiffs make no showing that the taking of Matthew Aragon's deposition would subject him to annoyance, embarrassment, oppression, or undue burden or expense.

Plaintiffs provide no evidence that Matthew Aragon is incapable of attending and answering questions at his deposition. Plaintiffs present no medical or mental health reasons for his non-attendance. Rather, Plaintiffs present evidence of an occasion in 2005 when Matthew Aragon had a behavior outburst. A historic behavioral outburst is not grounds for evading discovery.

---

[2] Matthew's date of birth is May 31, 1984. Exhibit 3 to Plaintiffs Motion for Protective Order at p.1. Matthew's same aged peers are currently 22 years old.

Plaintiffs' opposition to Matthew Aragon's deposition is based primarily on speculation from his counsel that he will be uncooperative. This contention is inconsistent with Plaintiffs' position in other phases of this case. For example, Plaintiffs contend that Matthew Aragon is entitled to lost wages as damages in this lawsuit. Plaintiffs' Response to Interrogatory No. 9, Exhibit A hereto ("Matthew certainly had the potential to be able to earn minimum wage for some period of a work week.") If, as Plaintiffs contend, Matthew is so severely disabled that he cannot be expected to sit for an afternoon for a deposition, how is it that he, with certainty, has the ability to hold down a part time job. At the least, Defendants should be afforded the opportunity to explore these contentions.

Similarly, Plaintiffs seek to introduce expert testimony of a vocational expert. The vocational expert interviewed Matthew Aragon, and based his opinions on that interview. See Plaintiffs' Expert Disclosure, Exhibit B hereto. Although reluctant at first, to be interviewed Matthew Aragon did participate in the interview, and Plaintiffs' vocational expert reported and based his opinions on findings that, *inter alia*, Matthew Aragon has an "excellent memory for things of interest"; has "warmth of spirit/caring personality"; is "intelligent /insightful"; and has interests in "computers"; "hi-tech/electronic repairs" and "reading". *Id.* at p. 2. Based on these and other findings, the vocational expert opines that Matthew Aragon is employable. Plaintiffs should have not the advantage of relying on this information to support their case, and then denying Defendants the opportunity to conduct discovery on it.

Plaintiffs were essentially non-responsive to Defendants' written discovery. See e.g. Plaintiffs' Response to Interrogatory No. 9, Exhibit A hereto, (Plaintiffs refuse to itemize, quantify, or describe with any degree of particularity the damages that Matthew Aragon allegedly suffered because of acts by APS). The court should not deny Defendants the

opportunity to explore Matthew Aragon's claims, as well as the other components of this case through deposition.

Fed.R.Civ.P. 26(c) provides that where a Motion for Protective Order is denied in whole or in part, "the court may, on such terms and conditions as are just, order that any party or other person provide or permit discovery."

APS requests that the court deny Plaintiffs' motion. If, however, the court enters an order imposing conditions on the deposition of Matthew Aragon, APS requests that the court impose terms and conditions that are just. The terms and conditions should include a provision that, if Plaintiffs are entitled to relief from discovery because of severity of Matthew Aragon's cognitive and behavioral disabilities, Plaintiffs be estopped from subsequently arguing in this lawsuit that Matthew Aragon is similarly situated to other students who do not have the same cognitive and behavioral disabilities. Plaintiffs should not be permitted to obtain relief from discovery on the basis that Matthew Aragon's severe cognitive and behavior needs compel a different set of rules, and then later seek monetary relief from the school district on the theory that the school district discriminated by recognizing these same severe cognitive and behavioral needs in relation to educational placement decisions. Furthermore, Plaintiffs should be estopped from introducing evidence of Matthew Aragon's alleged damages through other sources, such as Plaintiffs' vocational expert, from whom Plaintiffs seek to elicit testimony or documentary data *based on information allegedly communicated to them from Matthew Aragon.*

WHEREFORE, APS requests that the court deny in whole Plaintiffs Motion for Conditional Protective Order, and that, alternatively, if the court permits discovery subject to conditions, that those conditions include a provision that Plaintiffs be estopped from subsequently arguing in this litigation that Matthew Aragon is similarly situated to other students

5

who do not have severe cognitive and behavioral disabilities; that Plaintiffs be estopped from introducing evidence of Matthew Aragon's alleged circumstances or damages through other sources, such as Plaintiffs' vocational expert, who offer testimony or documentary data based on information allegedly communicated to them from Matthew Aragon; and for such other relief as the court deems just and proper.

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.

By: _____

Michael L. Carrico
Attorneys for Defendant APS
P.O. Box 2168
Albuquerque, New Mexico  87103-2168
Telephone: (505) 848-1800

WE HEREBY CERTIFY that a true
and correct copy of the fore-
going pleading was mail to
all counsel of record this
___7th___ day of November, 2006.

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.

By: _____

Michael L. Carrico

K:\dox\client\11301\588\W0649357.DOC

6

rate; 3) post-graduation matriculation to post secondary education or gainful employment.  Failing to collect any data is the easiest way to defend the status quo which pretends all students' needs are met.  Absence of data increases the invisibility of these students who have traditionally been invisible to the public, so invisible that they were excluded from public education all together, historically and in the present.

**INTERROGATORY NO. 8:**       Please state all facts upon which Plaintiffs base the allegations in the First Amended Complaint that APS intentionally discriminated against Matthew Aragon.

**ANSWER:**

1.     Back in the late 90s, APS's decision forms that went out to parents indicated when a student was not accepted based on lack of "program."  This reference was routinely used to deny transfer to students with disabilities.  For a period of time, APS's open enrollment transfer forms asked about receipt of special education and specifically threatened that failure to reveal special education status was grounds for revocation of transfer.

2.     APS approved Matthew's sister's transfer for 1999-2000 school year, the same year he was rejected.

3.     APS knew or should have known that Los Lunas did not have a "BIP program" comparable to West Mesa since APS had until the late 1990s entered in to MOUs to provide special education to students with disabilities from the Los Lunas district.  Yet, knowing that Matthew needed such a


EXHIBIT
A

program and Los Lunas did not have such a program, APS refused Matthew a

transfer and directed him to Los Lunas.

**INTERROGATORY NO. 9:**      Please itemize and quantify Matthew

Aragon's damages for emotional distress, pain and suffering, lost wages, and future loss

of income, as alleged in Paragraph 49 of the First Amended Complaint, specifying which

of those damages relate to alleged acts or omissions by APS, which to acts or omissions

by the Los Lunas Public School and which to alleged acts or omissions by the New

Mexico Public Education Department, and state all facts that support the existence of

such damages.

**ANSWER:**

It is not possible to apportion damages among defendants; apportionment is a

question for the jury, to be determined from all evidence at trial. The amounts which will

be claimed for emotional distress and pain and suffering will be based on all the evidence

and then determined by the jury: those amounts are unknown. At this time, lost wages

and future loss of earnings cannot be calculated by reference to anything other than

minimum wage. The purpose of special education is to prepare persons for independence

and self sufficiency, whenever possible. Matthew certainly had the potential to be able to

earn minimum wage for some period of a work week. Lost wages claimed from APS

would be calculated back to May 2006 ( a year after he prematurely left the Los Lunas

schools) and into the future based on life expectancy tables and a 20 hour week. To the

extent evidence at trial supported a different base figure other than minimum wage or a

different work week (other than 20 hours), the calculation would be adjusted to reflect admissible evidence.

**INTERROGATORY NO. 10:**      Please itemize and quantify Jose Aragon's damages for emotional distress, pain and suffering, lost wages, and future non-medical expenses, as alleged in Paragraph 50 of the First Amended Complaint, specifying which of those damages relate to alleged acts or omissions by APS, which to acts or omissions by the Los Lunas Public School and which to alleged acts or omissions by the New Mexico Public Education Department, and state all facts that support the existence of such damages.

**ANSWER:**

Three weeks' lost wages.  Had a lot of emotional stress, not knowing if I was going to be able to work, or who was going to take care of Matthew, and when and where he was going to school.  I had plenty of stress.

**INTERROGATORY NO. 11:**      Please itemize and quantify Patricia Aragon's damages for emotional distress, pain and suffering, lost wages, and future non-medical expenses, as alleged in Paragraph 50 of the First Amended Complaint, specifying which of those damages relate to alleged acts or omissions by APS, which to acts or omissions by the Los Lunas Public School and which to alleged acts or omissions by the New Mexico Public Education Department, and state all facts that support the existence of such damages.

**ANSWER:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JOSE and PATRICIA ARAGON,
for themselves and on behalf
of MATTHEW ARAGON,

Plaintiffs,

v.                                          No. CIV 03-299 JH/LFG

LOS LUNAS BOARD OF EDUCATION,
LOS LUNAS PUBLIC SCHOOLS,
ALBUQUERQUE PUBLIC SCHOOLS BOARD
    OF EDUCATION,
ALBUQUERQUE PUBLIC SCHOOLS,
NEW MEXICO PUBLIC EDUCATION DEPARTMENT

Defendants.

## PLAINTIFFS' EXPERT DISCLOSURE

Plaintiffs, Jose and Patricia Aragon, on behalf of their son, Matthew, pursuant to

Fed.R.Civ.P. 26 and the IPTR, disclose the following expert witnesses:

    1.    Richard Toscano

    Mr. Toscano did not charge for his time related to the administrative due process

hearing, including time spent preparing his report. For any further time spent, including for

testimony time, Mr. Toscano charges $125 per hour. Mr. Toscano has not provided expert

testimony in the last 4 years, except as a witness in the underlying due process case in this matter.

Richard Toscano did not review records in preparing his report. He has not published in the last

ten years. Attached to the copy of this pleading delivered to counsel are the following:



EXHIBIT

B

(A) expert report;
(B) c.v.;
(C) Mr. Toscano's testimony from the due process administrative hearing in this
matter.

Respectfully submitted,

**PEGASUS LEGAL SERVICES FOR CHILDREN,**

By: _____
     **TARA FORD**
     Attorney for Petitioners
     4916 Fourth St. NW
     Albuquerque, NM 87107
     Telephone: 505-244-1101
     Fax: 505-761-4514

**STEVEN GRANBERG ATTORNEY AT LAW, P.A.**
     **GAIL STEWART**
     Attorney for Petitioners
     1400 Central, S.E., Suite 3300
     Albuquerque, New Mexico 87106-4811
     Telephone: 505-244-3779
     Fax: 505-245-8558

I hereby certify that Plaintiffs' Expert Disclosure and listed attachments were delivered on

October 17, 2006 to counsel of record as follows:

1.     Delivered by Hand
       Michael Carrico
       Modrall Law Firm
       500 4th St. NW
       Albuquerque, NM 87102

2.     Delivered by Courier Service
       Tony Ortiz
       Scheuer, Yost & Patterson Law Firm

2

# *VOCATIONAL ASSESSMENT PROFILE*

Name:       **Matthew Aragon**
Date:        January 4, 2006
Location:    15 Dos Locos, Los Lunas, NM
Participants: Matthew Aragon, Patricia Aragon, Jose Aragon, Gary Olson, Rich Toscano
Facilitator:  Rich Toscano, Public Service Faculty
                Institute on Human Development and Disability
                University of Georgia / Athens, GA
                Email: rtoscano@uga.edu

1. <u>Basic Background</u> – Matthew is a 21 year old man of Hispanic heritage who lives
   with his family in Los Lunas, NM. He has been in Los Lunas for approximately six
   years. He was born and raised in Albuquerque prior to moving to Los Lunas.

   <u>Family and Significant Others:</u>
   Yvonne (28) – older sister who lives and works in Albuquerque and works in the
           court system. She is married to Charlie and has three boys (2, 10 & 12).
   Sarah (17) – younger sister who is a high school junior interested in pursuing work
           with the criminal justice / law enforcement / FBI.
   Uncle Frank – Yard Supervisor at NM Plaster
   Aunt Annette – Works in the judicial system

   Aunt Ann – Property Management
   Uncle Mark – 412 Union / Heating and Cooling Division

   Uncle Mark – Cisco Corporation / Computer programming – technology
   Aunt Rose – Follow The Sun Tours / Albuquerque, NM

   Grandmother and Grandfather – Grandfather works on cars and prior to
           retirement, worked at the base. Grandmother used to care for Matthew as a
           respite provider.

   (The family connections are important in the context of networking in the
           community for environments that might relate to Matthews interest areas.)



1
EXHIBIT
61

2. <u>Strengths and Gifts</u>  (unusual skills and/or unique gifts):

| <u>STRENGTHS</u> | <u>GIFTS</u> |
|---|---|
| • Intelligent / insightful | * intuitive /natural insight |
| • Computers | uncovers codes / combinations |
| • Hi-tech / electronic repairs | |
| • Reading; particularly books on Video games | |
| • Thoroughly enjoys movies / videos | |
| • Collector of older generations of video action games (e.g. – Atari) | |
| • Warmth of spirit / caring personality | |
| • Excellent memory for things of interest (can remember phone numbers, dates, codes, credit card numbers, video game part numbers) | |

3. <u>Personality</u>  (endearing and annoying qualities):

| <u>ENDEARING</u> | <u>ANNOYING</u> |
|---|---|
| • *Pleasant, caring* | * can be loud |
| • Sense of humor | * perseverating on topics |
| • Warmth of spirit | * can be repetitive |
| | * sometimes demanding and impatient |

4. <u>Obstacles/Interfering Factors</u>  (circumstances or disability related factors; e.g., medications that get in the way of attaining goals/aspirations/dreams):

<u>OBSTACLES</u>

- Weight gain from meds
- Questionable med combination given his age
- Lack of experiences in community to build relationships and experiences that might lead to vocational opportunities
- Inadequate training / education to pursue his interest areas and life aspirations

5. Life Experiences (includes a chronology of schooling and work history):

Early 90s – elementary school, grades 1-6        Montezuma Elementary
        (teachers were excellent with Matthew; established a rapport with him and he
        responded well to the str cture and support)
        Teachers names – Glen, Denise, Beth (Matthew had good memory of the
        teachers and their interactions with him. It appears to be a positive memory)

Mid 90s -     Grant Middle School
              Children's Psychiatric Hospital

'96 / '97 -   Hogatis School

'98           Out of school; family struggling with schooling options

'99           Moved to Los Lunas

'00 – '04     Entered Los Lunas HS; entered in a classroom with troubled kids
              (ongoing struggles in a variety of classrooms – much of the experience has
              been a "power struggle" with teachers)

'05           Matthew was on the verge of graduating – episodes in school and
confrontations with teacher led to police being called Matthew leaving with the
impression that he met the requirements for graduation; but to date, Matthew has not
received a diploma. It is reported that Matthew missed out on opportunities to attend
day and field trips which further limited his education and potential for the future.

6. Current Routines and Rhythms - (where does person live, with whom, how does
   person spend the day, what relationships does the person have):

   • Early riser around 6 am on most mornings – makes bed, cleans room, makes
     breakfast and prepares lunch to take to day program.
   • During the weekdays (8:45 am – 2:45 pm, Matthew attends ADC Day Program in
     Los Lunas. Some of the activities at the day program include visits to the park,
     library, senior center, casino, Wallmart, Hastings, etc.

At other times at home, Matthew likes to do the following:
   • Wallmart – likes to go over to the video and electronics section. Matthew has
     become acquainted with Michelle, with whom he has a teasing / friendly
     relationship.
   • Hastings
   • Movies – Translux Theater

7. <u>Ideas about the future?</u>  (ideas of others who know the person)

- Continuing Education Classes – maybe computer or electronics to enhance Matthew's skills
- Part-time work in video or computer stores
- Collection of older, collectable toys
- Business within a business concept connected to a business or store he values / enjoys

8. <u>Dreams or Aspirations</u>  (ideas the person has for self)

- Do something related to parts for video or computer games
- Have a job; more ongoing community relationships



## Strategic Employment Plan of Action

Matthew Aragon
Date: January 4, 2006

Plan Facilitator:
Rich Toscano, Public Service Faculty
Institute on Human Development & Disability
University of Georgia / Athens, GA

1 <u>EMPLOYMENT STATUS</u>     (Job search or job retention)
If employed, describe job, hours and duties:
If in job search, describe optimal employment desired:
> Matthew attends a Day Program sponsored  by
> Adelante Developmental Center to fill the void
> left by leaving high school with no prospect for
> employment or meaningful daytime, valued activities.

2 <u>EMPLOYMENT PLAN  ACTION STEPS:</u>
  A   Rationale for the intervention (Describe the skills,
      experience and/or personal attributes that fostered
      this plan of action):
> Matthew is a bright, young man who sometimes has a
> hard time articulating his thoughts and interests.
> His is particularly interested in and, by some accounts,
> skilled at electronics repair / assembly.  He has a
> fascination with old Atari Video Games and has
> stated an interest in collecting Ataris and related
> items.  Matthew would like to work in the near
> future and would like assistance with his vocational
> planning.  He has a very good memory for names and
> numbers, skills and traits that are highly valued
> in many work / employment environments.

  B   Outcomes Desired:
      1 Environment:     matthew's identity would be best served
                         by working in a business or setting
                         related to electronics, video games or
                         computers
      2 Duties:          Inventory control, electronic or
                         computer repair
      3 Recommended Supports for Success:        Matthew will
                         need assistance with transportation and
                         redirection to tasks when he becomes
                         distracted



C   Alternative Clinical Supports and/or Interventions that
      will enhance the individual's employment success
            matthew is currently on a number of medications that
            have been a carryover for an extended period of time.
            Matthew has gained a lot of weight related to the meds
            and there is some question whether it is safe  for him to
            *continue on the meds and/or dosages.*

D   Strategic Plan
      Introduction:  In reviewing Matthew's life experiences,
      family relationships, routines, rythmns, interests and
      preferences, it appears Matthew has been judged in
      superficial terms as to his potential (both as a student and
      future contributing member of the community.
      Matthew can either be interpreted as easily distractable,
      sometimes socially and interpersonally inappropriate
      and challenging of authority or as a bright and
      frustrated young man who cannot easily communicate
      the many thoughts, wishes and desires he has for his short
      and long term future.
      If his educational experience were one of respecting him
      for his uniqueness, rather than punishing him for his
      disability related tendencies, his high school experience
      may have gone a very different path.
      The intent of this vocational profile and strategic plan is
      to explore some remedies for what windows of opportunity
      were lost in the school experience and re-focus a direction
      with and for Matthew that capitalizes on his strengths and
      talents, not his weaknesses or disability related learning
      style.
      The folllowing actions steps are preliminary recommendations
      for some direction setting to assist Matthew to re-capture
      a sense of self through appropriate training and education,
      and establish a plan for compensating him for what he did not
      receive in his free and appropriate educational experience.

| Action Step: | Who: | Target Date: |
|---|---|---|
| 1   Establish a funding mechanism and plan for Matthew to receive training and education related to his skill and interest areas (computer, electronics assembly / repair. | Atty. Tara Ford<br><br>Los Lunas<br> Educational<br> Authority<br><br>Parents | <br><br><br>Mar-06 |



| 2 | Process a referral to DVR to begin the process of a new and complete medical evaluation to give input into the medication issues. | Adelante Day Program<br><br>Assistance from parents | Jan-06 |
|---|---|---|---|
| 3 | Investigate the options for continuing education or adult education training or classes related to Matthews stated goal of working in the technology field. | Gary Olson<br><br>Parents<br><br>DVR (once application & process complete | Feb-06 |
| 4 | begin the process of networking with family and friend connections in Matthews life to afford him the dignity and satisfaction of working and making some money lke other young men of a similar age.<br>(the following steps are some examples of starting points for this step. It is important to note that we are not asking family members or friends to offer jobs, but once they see and hear the direction Matthew is moving, they might be able to offer ideas or contacts because they know and like/love Matthew.) | | Ongoing |
| 5 | Contact Uncle Mark who works at Cisco to learn more about environments or businesses that relate to computer assembly or electronics. | Jose Aragon with the support of an employ. specialist / job developer thru DVR / ADC | Feb-06 |



| | | |
|---|---|---|
| 6 | Meet with Michelle from Wallmart to explore the types of jobs related to matthew's interest areas that might be pursued and whether she would be able to advocate within the store for opportunities. (This action Step would be with the intent of establishing some short-term work opportunities while he explores his options for training and education toward a more substantial work experience in his interest area. | same as above | Mar-06 |

(These ideas are a starting point for continued planning and support to Matthew as he establishes plans for his future. Many of these types of activities could have been pursued as part of the Individual Educational Plan - Transition Planning. Transition planning should have engaged DVR while Matthew was still in school. The current reality is that we need to move forward from where we are today. There are reasonable remedies for what Matthew lost in his educational experience and by partnering with the school district and dvr in a spirit of cooperation, much of this can be pursued without a great deal of expense.)

*** This plan is a starting point for discussion. The ideas and strategies are recommendations based on a two hour motivational interview assessment. This is a "person-centered" planning process that helps individuals and families begin the process planning one's future. This plan can and should evolve, be amended and become a "living document" reflecting the progress Matthew makes toward his goals, dreams and desires.

Aragon v. Los Lunas Public Schools
Case 1:03-cv-00299-JCH-LFG   Document 83   Filed 11/07/06   Page 20 of 21
Due Process Hearing, Volume 2

29 (Pages 424 to 427)

Page 424

1  object in that I think it misstates what the law is
2  with regards to students' attendance in school.
3  There is no right to attendance. There is a
4  privilege.
5       HEARING OFFICER: Well, I'm just not sure
6  it's the issue. I -- I don't know -- the issue is
7  what is Matthew's abilities and tolerance and
8  whether a program can be delivered to him in a
9  full-day setting. That's the issue. I mean,
10 obviously, full day is what every school intends to
11 deliver to every student. So I don't -- you know.
12 I'm not going to sustain the objection, if you want
13 to ask that question, you can go ahead and ask it.
14 But for me, that's not the issue. The question is
15 Matthew and his abilities to deal with a full-day
16 program. I'm trying to understand that.
17      MS. STEWART: And Your Honor, just by way
18 of response, I -- my legal analysis is that after
19 Honig v. Doe, the whole point of special education
20 was that the students with behaviors were those that
21 were being excluded. And the point was, we need to
22 have special education so that they're in school,
23 the same as other people. So I have a different
24 analysis and I guess that's why I'm asking.
25      HEARING OFFICER: Which is legal argument.

Page 425

1  I'm talking about what we asked this witness in
2  terms of his understanding. And he's not, to my
3  knowledge, an expert in legal analysis. You haven't
4  laid that foundation.
5       But let's overrule the objection, ask the
6  question, get an answer and break for lunch.
7       MS. STEWART: I'm sorry, Ms. Chapman. I'm
8  going to need to ask you to read that back.
9       (The record was read by the reporter.)
10      THE WITNESS: Answer that?
11      HEARING OFFICER: Yes.
12      THE WITNESS: I believe Matthew had a
13 right to FAPE. And I believe we provided it.
14      HEARING OFFICER: Let's break for lunch,
15 and please make sure you're back here by 1:00 so we
16 can make that phone call. Is Mr. Toscano calling us
17 or we're calling him?
18      MS. STEWART: We're calling him.
19      HEARING OFFICER: Okay.
20      MS. STEWART: And the only thing I want to
21 state is if it doesn't work, I want to continue with
22 Mr. Ogas. So you'll be back?
23      MR. OGAS: I'm not going anywhere.
24      HEARING OFFICER: Okay.
25      (A recess was taken at 11:43 a.m., and

Page 426

1  reconvened at 12:57 p.m., as follows:)
2       HEARING OFFICER: So Mr. Ogas, we're going
3  to put you on hold again for the remainder of your
4  testimony and go back on the record with
5  Mr. Toscano. Am I pronouncing your name correctly,
6  Mr. Toscano?
7       THE WITNESS: Yes, that's correct, thanks.
8       HEARING OFFICER: And you can hear me all
9  right?
10      THE WITNESS: I can hear you, yes.
11      HEARING OFFICER: My name is Barbara
12 Albin. And I'm the Hearing Officer presiding over
13 this matter. And I realize I can't see you. But I
14 would like to at least go through the formalities of
15 administering an oath. And I'd like you to raise
16 your right hand and repeat after me -- not repeat
17 after me. Answer this question. Do you solemnly
18 swear to tell the truth, the whole truth and nothing
19 but the truth?
20      THE WITNESS: Yes, I do.
21
22
23
24
25

Page 427

1            RICH TOSCANO,
2       after having been first duly sworn under oath,
3       was questioned and testified as follows:
4       HEARING OFFICER: All right. Mr. Toscano,
5  your testimony is being taken down by a court
6  reporter. And we will ask that you make sure your
7  answers are verbal, as opposed to uh-huhs and uh-uhs
8  that are difficult to transcribe. And we need to be
9  sure, even more importantly with this speakerphone,
10 that you allow the attorneys to complete their
11 questions before you begin answering. And if at any
12 point you can't hear us, please let us know.
13      THE WITNESS: I understand, thanks.
14      HEARING OFFICER: Thank you. And I'll let
15 Ms. Stewart begin her questioning.
16          DIRECT EXAMINATION
17 BY MS. STEWART:
18      Q.  Mr. Toscano, I am just moving up closer to
19 the phone. And again, if you don't hear me, please
20 let me know.
21      A.  Okay.
22      Q.  Where are you today?
23      A.  I'm in Decatur, Georgia.
24      Q.  Okay. And how are you employed,
25 Mr. Toscano?

Page 436

1 .. Matthew that he is a bright young man. And
2 unfortunately, his learning style didn't appear to
3 fare well for him in more of a traditional
4 educational setting.
5     So based on the interests I heard him
6 express and also the people that knew him well in
7 his family -- and there was another gentleman
8 present, a Mr. Olson -- he seems to have a lot of
9 interests and also some insight and skills around
10 video games and video parts and electronics. So it
11 seemed to me that exploring that further would be
12 something that is a high motivator for Matthew, and
13 possibly some training around either electronics
14 assembly or parts and inventory work might be
15 actually very motivating for him in the future.
16    Q. Did you have any specific recommendation
17 about whether Matthew could pursue such training
18 independent of any person supporting him in the
19 actual training or whether he would need assistance
20 to access training?
21    A. It appears to me -- and I would definitely
22 need more time, having only met him, that --
23 actually, two days, one night and then the following
24 day we did the vocational profile plan -- that he
25 might need some assistance to work through a more

Page 437

1 traditional training or educational program. Some
2 of the issues around his disability, I think,
3 interfere with his learning style, and he might need
4 to have an interpreter, if you will, sort of a tutor
5 kind of assistant to be able to do that well in a
6 traditional training program.
7    Q. When you gave as your opinion that he
8 seemed to you to be a bright person, I'm just
9 wondering if you could expand on what made you see
10 possibilities there in terms of him being able to
11 learn new things.
12    A. Yes, of course. He demonstrated,
13 actually, in the context of my conversation with
14 him, quite a good memory. He remembered the names
15 of teachers he had when he was very young in
16 elementary school and junior high school within
17 seconds. And we hadn't been talking about that
18 before. So it was just recall.
19    It was also shared with me that he had the
20 unique skill around remembering numbers. He hears
21 somebody, you know, share a number of a -- a phone
22 number or even a credit card number, and he can
23 recall that 15, 20 minutes later and remember the
24 number in sequence, which, you know, is a rather
25 unique skill not everybody can do. And there are

Page 438

1 certain applications of that in the workplace in
2 terms of inventory control or trying to pull parts
3 or things like that.
4    So I think he has some skills that aren't
5 easily seen, I think, in traditional educational
6 settings that are applicable to the workplace. And
7 one of the things that we promote, or I promote in
8 my work, is what we call support employment or
9 customized employment, looking at the unique skills
10 that individuals with disabilities have and finding
11 settings that that is valued and where he can have a
12 productive role in establishing an identity that's
13 valued by others.
14    Q. Did you have any difficulty obtaining
15 information from Matthew in terms of how he
16 interacted with you?
17    A. He was very pleasant, actually. The first
18 night that I went to visit him, the family had told
19 me that they weren't sure Matthew would come out, my
20 being a stranger and new to him in his life. And in
21 fact, that was true. For the first 15 or 20 minutes
22 that I was visiting the home, he stayed in his room
23 and didn't come out.
24    But as I was chatting with his family,
25 I -- approximately 20 minutes later, he decided to

Page 439

1 come into the dining room and sat at the table and
2 interacted very appropriately. He was fairly
3 articulate, and he seemed to be comfortable after
4 talking for a while. And obviously, I was very
5 careful to be very respectful of him and not pry
6 without him wanting to.
7    So I thought we had a very good
8 interaction, and he stayed there and was very
9 attentive to the conversation for a while. And when
10 I suggested I better go and that we'd come back the
11 next day and do the profile, he seemed to want to
12 continue to talk.
13    Q. And did you find him equally as reciprocal
14 the next day then when you came back?
15    A. The next day, he was out and ready to go
16 when I arrived at his house. And we sat again for
17 over -- close to two hours, I believe, on that
18 second visit. And he was attentive to the whole
19 process and he was very much engaged in the process.
20    Q. In terms of your knowledge of New Mexico,
21 Mr. Toscano, and what you learned about Matthew, is
22 there any particular training that you know of right
23 now that you believe would be appropriate in terms
24 of supporting him in moving forward to some sort of
25 meaningful employment?